IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| "NAZARBAYEV FUND" PRIVATE FUND<br>53 Kabanbay Batyr Avenue<br>Yessil District, Nur-Sultan City 010000<br>Republic of Kazakhstan<br><br>                                          Plaintiff,<br><br>          v.<br><br>JOURNALISM DEVELOPMENT NETWORK,<br>INC.<br>7 St. Paul Street, Suite 820<br>Baltimore, Maryland 21202<br><br>                                          Defendant. | Civil Action No. 22-cv-1880<br><br>**COMPLAINT** |

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................................. 4

PARTIES ................................................................................................................... 6

JURISDICTION AND VENUE ................................................................................ 7

FACTUAL ALLEGATIONS .................................................................................... 7

I.   Plaintiff Is a Non-Profit Organization Whose Sole Purpose Is Strictly Limited to Providing Financial Support for Western-Style Higher Education in Kazakhstan Through NU and NIS .......................................................................................................................... 7

   A.   Plaintiff Was Founded to Financially Support NU and NIS and Help Provide a Bridge to the West by Bringing Western-Style Higher Education to Central Asia ............................ 8

   B.   Plaintiff's Funds Are Protected by Strict Legal Safeguards on How Funds are Used and Rigorous Oversight to Ensure Compliance with the Law ................................................. 9

II.   OCCRP Is an Online Publication That Purports to Expose Crime and Corruption ....... 13

III.   OCCRP's Newsgathering Process Was Reckless and Purposefully Avoided the Truth 13

IV.   The Story Falsely Claims That Plaintiff's Assets *De Facto* Belong to, and Are Entirely Controlled By, Nursultan Nazarbayev ................................................................................... 23

   A.   The Headline, Subtitle, and Key Findings in the Story Are False and Defamatory ... 23

   B.   The Body Text of the Story Contains False and Defamatory Statements ................. 26

V.      Defendant Concealed from Its Readers Facts about Kazakhstani Law That It Knew

Disproved Its Thesis and Purposefully Avoided the Truth by Not Verifying the Statements of

Defendant's Unnamed "Legal Experts" ..................................................................................... 27

VI.      The Story Harms Plaintiff's Ability to Safeguard Assets for Future Generations of

Kazakhstani Students ................................................................................................................ 28

FIRST CAUSE OF ACTION – DEFAMATION ......................................................................... 29

PRAYER FOR RELIEF ............................................................................................................... 30

"Nazarbayev Fund" Private Fund[1] ("Plaintiff" or the "Nazarbayev Fund") alleges upon personal knowledge as to itself and its own conduct, and upon information and belief as to all other matters, as follows:

## PRELIMINARY STATEMENT

1.      This case concerns the knowingly false publication by Defendant of various statements accusing the Nazarbayev Fund, a non-for-profit educational endowment devoted by law to supporting Western-style education in the Republic of Kazakhstan, of being a corrupt vehicle to launder the wealth of that country's former President.  In reality, the Nazarbayev Fund exists – and by law *can* exist – only to fund the research and operations of a private university. The former President has no ability whatsoever to direct the Nazarbayev Fund's assets to *any* other purpose, let alone for his personal benefit.

2.      Journalism Development Network, Inc. ("JDN") trades as the Organized Crime and Corruption Reporting Project ("OCCRP"; collectively with JDN, "Defendant") and owns and operates the OCCRP website ("Website").  On January 19, 2022, Defendant published an article titled "*The Nazarbayev Billions: How Kazakhstan's 'Leader of the Nation' Controls Vast Assets Through Charitable Foundations*" (the "Story") on the Website. In the Story, Defendant accused Plaintiff of participating in a multi-billion-dollar corruption and money laundering scheme to help former Kazakhstan president Nursultan Nazarbayev hide and protect his personal assets.  As set forth in this complaint, the Story is false and defamatory.

3.      In fact, Plaintiff is a Kazakhstan-based not-for-profit endowment with a chartered purpose of supporting Western-style education and research for the benefit of the people of

---

[1]      Nazarbayev Fund is erroneously referred to in certain reporting as the Nazarbayev Foundation.

Kazakhstan, through Nazarbayev University ("NU") and Nazarbayev Intellectual Schools ("NIS").  Plaintiff directly supports both NU and NIS, two of Kazakhstan's preeminent educational institutions.  Plaintiff's charter (the "Charter") and Kazakhstani law both expressly bar Plaintiff from using its assets for any other purpose.

4.      Defendant knew—because Plaintiff told its reporter prior to publication—that the Charter and Kazakhstani law barred the misuse of funds that Defendant *speculated* in its Story could occur.  In pre-publication communications with Defendant's reporter, Plaintiff cited specific law that restricts the use of Plaintiff's funds to supporting NU and NIS.  Only a new act passed by the Parliament of Kazakhstan could change the law.

5.      Defendant kept these facts from its readers and recklessly disregarded them in its Story.  Nowhere in the Story did Defendant report that Kazakhstani law expressly prohibited the precise misuse that Defendant hypothesized could theoretically occur.  Instead, Defendant reported the opposite: that "legal experts contacted by OCCRP explained that, under Kazakhstani law, the founder of a private foundation [Mr. Nazarbayev] has ultimate control over its assets." Defendant knew this was false or, at a minimum, recklessly disregarded the truth by deliberately not raising with Plaintiff its basis for ignoring the statutes specifically governing Plaintiff's use of funds.

6.      The Story has been reprinted around the world, including in *The Kyiv Independent*[2] and *Hetq*.[3]  The defamatory assertions from the Story have been republished by a

---

[2]      https://kyivindependent.com/regional/occrp-how-kazakhstans-leader-of-the-nation-controls-vast-assets-through-charitable-foundations-investigation.

[3]      https://hetq.am/en/article/140330.

variety of prominent publications including *The Guardian*,[4] *Open Democracy*,[5] *The Telegraph*,[6] and *The Bureau of Investigative Journalism*.[7]  Defendant is directly responsible for creating a now-widespread false narrative that Plaintiff is Mr. Nazarbayev's personal piggybank.

7.      As of the date of the filing of this complaint, Defendant's Story is still the first Google search result for Plaintiff's name over six months after the Story's publication.  The Story is causing Plaintiff harm by interfering with its nonprofit activity at every level.  Plaintiff brings this lawsuit to set the record straight.

## **PARTIES**

8.      Plaintiff is private fund, with a chartered charitable purpose, formed on December 3, 2009 under the laws of the Republic of Kazakhstan, with its principal place of business at 53 Kabanbay Batyr Avenue, Yessil District, Nur-Sultan City 010000, Republic of Kazakhstan. Pursuant to its Charter, the fund exists "exclusively for the purposes of financing the activities" of educational institutions NU and NIS.

9.      Defendant is a 501(c)(3) corporation formed on August 21, 2007 under the laws of Maryland with its principal place of business in Baltimore, Maryland.  JDN publishes the OCCRP online news publication.

---

4       https://www.theguardian.com/world/2022/jan/16/where-is-kazakhstans-former-longtime-leader-nursultan-nazarbayev.
5       https://www.opendemocracy.net/en/odr/nursultan-nazarbayev-kazakhstan-former-president-linked-to-78bn-in-assets-in-uk-company/.
6       https://www.telegraph.co.uk/business/2022/02/17/former-kazakh-dictator-controlled-6bn-empire-britain/.
7       https://www.thebureauinvestigates.com/stories/2022-02-17/kazakh-ex-dictator-used-uk-company-to-help-protect-8-billion-business-empire.

## JURISDICTION AND VENUE

10.     This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1332 because

there is complete diversity of citizenship between the parties and the amount in controversy,

exclusive of interest and costs, exceeds the jurisdictional sum of $75,000.

11.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(1) because

Defendant resides within this judicial district.

12.     The Court has personal jurisdiction over the Defendant because its incorporation

and principal place of business are in Maryland.

## FACTUAL ALLEGATIONS

**I.      Plaintiff Is a Non-Profit Organization Whose Sole Purpose Is Strictly Limited to
Providing Financial Support for Western-Style Higher Education in Kazakhstan
Through NU and NIS**

13.     The Republic of Kazakhstan is a nation located in central Asia.  Kazakhstan

gained its independence from the former Soviet Union in 1991.

14.     Upon obtaining independence, Nursultan Nazarbayev became the first President

of Kazakhstan.  Under his rule, Kazakhstan privatized the economy, transitioning from

communism to capitalism.  Over twenty-five years, Kazakhstan grew to produce 60% of central

Asia's Gross Domestic Product.

15.     In 2010, Mr. Nazarbayev was granted the formal title of Leader of the Nation.

Mr. Nazarbayev served as President until March 19, 2019, when he resigned from the

Presidency.

16.     In 2019, Kassym-Jomart Tokayev succeeded Mr. Nazarbayev as President of

Kazakhstan.

17.     Since resigning as President in 2019, years before the Story was published, Mr.

Nazarbayev has lost significant influence over Kazakhstani politics.  In February 2022, Mr.

Nazarbayev was stripped of his lifetime chairmanship of the Security Council and the People's Assembly and stripped of his veto power over certain areas of domestic and foreign policy.  In June 2022, Mr. Nazarbayev's family lost their constitutional immunity from prosecution, and Mr. Nazarbayev lost his special status as Leader of the Nation.[8]

18.       Mr. Nazarbayev has stated that he has retired from public life.

**A. Plaintiff Was Founded to Financially Support NU and NIS and Help Provide a Bridge to the West by Bringing Western-Style Higher Education to Central Asia**

19.       Plaintiff is a non-profit educational endowment formed as a private fund under the law of the Republic of Kazakhstan in 2009.  In its founding documents, its Charter states, "[Plaintiff] is created exclusively for the purposes of financing the activities of the autonomous organization of education 'Nazarbayev University', 'Nazarbayev Intellectual Schools', and its organizations."

20.       With the framework for its continued financial support in place, NU was founded in 2010 in Kazakhstan's capital of Nur-Sultan (then known as Astana).

21.       NU is a public university with over 3,000 undergraduate and over 1,000 graduate students.  NU is a flagship, research-intensive Kazakh university modeled after Western-style institutions of higher education.  NU has four undergraduate schools – Mining and Geosciences, Engineering and Digital Sciences, Sciences and Humanities, and Medicine – and three graduate schools – of Public Policy, Education, and Business.  NU provides substantial scholarships and grants to Kazakh students and prides itself on exceptional graduate prospects.  Its undergraduate

---

[8]       Additionally in June 2022, the Kazakhstani government passed anti-corruption measures barring (1) any relatives of the President from holding government positions and (2) the President from being a member of a political party while in office.

students have progressed to graduate study at Harvard University, Columbia University, Stanford University, Yale University as well as the Universities of Oxford and Cambridge.

22.     Shigeo Katsu has served as NU's President since 2010.  Mr. Katsu previously worked at the World Bank for thirty years and served as that institution's Vice President for Europe and Central Asia.  Mr. Katsu received his B.A. in International Relations/Economics from the Tokyo University for International Studies and pursued graduate studies at the Tokyo University.  He also received a Diploma in International Economics/International Relations from the Diplomatic Academy of Vienna, Austria.

23.     Under Mr. Katsu's leadership, NU has become one of Central Asia's leading research universities.  NU's stated goal is to position Nur-Sultan as an international research and innovation center.  NU seeks to be a bridge to the West by building academic relationships with elite European and American universities.  For example, NU has strategic partnerships with Cambridge University, Duke University, University of Pennsylvania, University of Pittsburgh, and the University of Wisconsin.  In order to maintain the international standards of its strategic partners, NU has engaged the European University Association's Institutional Evaluation Program to obtain an external, independent review of its academic progress.

24.     NU is funded in part through public funds and Plaintiff.  Today, Plaintiff holds at least approximately $1.1 billion in net assets in an endowment intended to help support NU and NIS into the future.  Plaintiff's funding helps provide a source of financial stability for NU and NIS regardless of changes in the availability of government funding in Kazakhstan.

**B.  Plaintiff's Funds Are Protected by Strict Legal Safeguards on How Funds are Used and Rigorous Oversight to Ensure Compliance with the Law**

25.     In addition to general Kazakhstani laws governing non-profit organizations, Plaintiff is subject to a specific statute governing its Charter and activities. Plaintiff's activities

are governed by its Charter and the Civil Code of the Republic of Kazakhstan ("Civil Code"), specifically, a statute called "On the Status of Nazarbayev University, Nazarbayev Intellectual Schools and Nazarbayev Fund" (hereinafter referred to as "Law on NU, NIS, and NF") and the statute On Non-Profit Organizations ("Law on NPO").

26.    Article 107 of the Civil Code of Republic of Kazakhstan and Article 12 of the Law on NPO stipulate that Plaintiff is a non-profit organization, established for the social, charity, cultural, educational, and socially beneficial activities.

27.    The Civil Code and other relevant criminal laws of the Republic of Kazakhstan provide sharp penalties for non-profit organizations that abuse their tax-free charitable standing and deviate from their charitable purpose.  For example, Article 107 of the Civil Code and Article 42(1) of the Law on NPO establish that if a non-profit organization pursues actions that conflict with the charitable purpose stipulated in its charter, then the activity of the non-profit organization can be suspended and/or the organization will be liquidated.

28.    Article 33(1) of the Law on NPO prevents any profits of non-profit organizations from being distributed among the founders of non-profit organizations.  By Kazakhstan law, profits must be allocated for statutory purposes.

29.    Plaintiff's Charter states that the organization's exclusive purpose is to provide funding for NU and NIS.

30.    This restriction in the Charter, moreover, is specifically enshrined in law and cannot be changed without an act of Parliament.  Article 4(4) of the Law on NU, NIS, and NF provides that Plaintiff's sole purpose is financing the activities of NU and NIS and their organizations.

31.     Plaintiff's corporate governance ensures that it has ample oversight to enforce compliance with the organization's charter and the law.

32.     Plaintiff is organized with a Supreme Board of Trustees, a Board of Trustees, and a Management Board.  The Supreme Board of Trustees is responsible for approval of Plaintiff's long-term development strategies, any decision-making on reorganizations or liquidation, and appointment of the Board of Trustees.  The Board of Trustees is, in turn, responsible for development of plans/concepts, accounting policies, investment policies, and regulation of the Management Board – including, but not limited to determining the number of members and electing the chairman.  The Management Board is responsible for Plaintiff's day-to-day operations.

33.     Mr. Nazarbayev formally serves as Plaintiff's Chairman of the Supreme Board of Trustees, but he is not actively involved in Plaintiff's operations.  Mr. Nazarbayev cannot remove and replace all trustees.  Were Mr. Nazarbayev to die, any power formerly vested in his position as Chairman would immediately be split into three permanent chairs on the Supreme Board of NF made up of senior government, NU, and NIS leaders.  In no circumstance would Mr. Nazarbayev's family obtain any authority over Plaintiff or the assets that Plaintiff stewards for future generations of Kazakh students.

34.     Plaintiff benefits from additional external oversight by retaining international accounting firms to routinely audit its financials.  Plaintiff changes auditing firms every three years to ensure independence.  Plaintiff is currently audited by KPMG.

35.     Pursuant to Kazakhstan law and business practices, Plaintiff's financial records are maintained according to International Financial Reporting Standards ("IFRS").  Plaintiff

engages an experienced team of local and international lawyers, accountants, and advisors to maintain compliance with all applicable laws, regulations, and accounting standards.

36.     Plaintiff's assets are further protected from mismanagement by robust provisions of Kazakhstan law.

37.     Article 37 of the Law on NPO strictly regulates transactions involving Plaintiff and members of Plaintiff's management body, relatives, and creditors of the company, and provides stiff civil, administrative, and criminal penalties for violations.

38.     Under Article 157 of the Civil Code, any transactions pursued by Plaintiff in violation of its statutory and chartered purpose can be invalidated by a court order, and any prosecutor or affected person has standing to bring a suit.  This provides robust protection against the sort of defamatory allegations made by Defendant.  Powerful political opponents, prominent government officials including the Prime Minister and Minister of Finance, and leaders of NU and NIS all hold trustee positions within Plaintiff's organizational structure. Any of them would have incentive, access, and ability to file suit to block any corrupt dealings by Plaintiff.  As such, it is not surprising that Defendant has been unable to point to a single piece of evidence that any corrupt transaction contrary to the Plaintiff's chartered purpose has ever been contemplated, much less occurred.

39.     Under Article 5 of the Law on NPO, Plaintiff has a right to bring suit to seek reimbursement from transactions completed contrary to its statutory and chartered purpose.

40.     If Plaintiff was liquidated for any reason, Article 107(8) of the Civil Code provides that Plaintiff's remaining assets shall be used for the purposes set forth in its Charter— *i.e.*, to provide financing for the activities of NU and NIS. The Law on NU, NIS, and NF provides the same.

41.     The Civil Code cannot be amended without passage of a law by the Kazakhstan Parliament.

## II.     OCCRP Is an Online Publication That Purports to Expose Crime and Corruption

42.     Defendant's OCCRP is an online news publication whose self-described mission is to "expose crime and corruption."

43.     OCCRP has a world-wide scope of operations.  Former investigations have taken place in Europe, the Middle East, Central Asia, Asia, South America, and other regions.  As a result of its various publications, there have been hundreds of government investigations, arrests, and resignations, as well as billions of dollars in fines and asset seizures.  Its focus is on criminal activity and corruption and subjects of their stories often face significant reputational and legal consequences.

44.     Over the last decade, OCCRP has written dozens of stories about subjects in Kazakhstan, all of which have been on the subject of crime and/or corruption.

## III.     OCCRP's Newsgathering Process Was Reckless and Purposefully Avoided the Truth

45.     On January 14, 2022, Defendant's reporter, Miranda Patrucic, wrote to Plaintiff and asked the following questions (translated from the original Russian):

i.     "Why does the Nazarbayev Foundation belong to Nursultan Nazarbayev personally rather than to Nazarbayev University or Nazarbayev Intellectual Schools? Why was it registered in the form of a private fund?"

ii.     "Does the Nazarbayev Foundation in actual fact finance Nazarbayev University and Nazarbayev Intellectual Schools? What percentage of the financing is provided by the Nazarbayev Foundation? Can you provide us with documents confirming how much the Foundation has provided to these educational institutions and when this was done?"

iii.     "Can you provide us with copies of the Nazarbayev Foundation's charter and annual reports?"

iv.   "If the Nazarbayev Foundation's role is to finance Nazarbayev University and
Nazarbayev Intellectual Schools, why did these educational institutions need to
create their own foundations, namely, the Social Development Foundation and the
Development Foundation?"

v.   "In 2019, why did the Nazarbayev Foundation become the majority shareholder
of Pioneer Capital Invest, which before that had belonged to the corporate
foundations Nazarbayev University and Nazarbayev Intellectual Schools?

vi.   "How much did the Nazarbayev Foundation invest in Pioneer Capital Invest?
What was the source of these funds?"

"How much did Pioneer Capital Invest and its subsidiary companies pay to
acquire the following property, assets, and enterprises?"  A list of 33 assets
followed, including several banks and shopping malls.

vii.   "Under what circumstances were the Nazarbayev Foundation's subsidiaries given
five land lots . . . for their temporary use? What are your plans for these lots?"

46.   Later, on January 14, 2022, Aslan Sarinzhipov responded on behalf of Plaintiff.

Mr. Sarinzhipov identified himself as Chairman of the Management Board of the Nazarbayev

Fund, the functional equivalent of its CEO. He provided Defendant with background concerning

Plaintiff, explaining (translated from the original Russian):

> The Foundation is an educational endowment fund created with the sole
> purpose of financing Nazarbayev University (NU) and Nazarbayev
> Intellectual Schools (NIS) and their subsidiary organizations. It was
> founded by the First President of Kazakhstan. However, despite being the
> Foundation's founder, ***he is not its owner***, since we are a nonprofit
> organization (meaning that the founder is not entitled to profit from the
> Foundation's activity). The Foundation was created using contributions
> from private companies and individuals. ***Income from the Foundation's
> investments is used to finance NU and NIS.*** Its activity is governed by
> the Republic of Kazakhstan Law "On the Status of Nazarbayev
> University, the Intellectual Schools, and the Nazarbayev Foundation." Our
> activity is transparent, being governed by a board of trustees and audited
> by international auditing companies. Up to present, we have provided NU
> with around 20 billion tenge [about USD $46.5 million] in financing. This
> is all reflected in our annual reports.
>
> (Emphasis added.)

47.   Ms. Patrucic replied later that day with additional questions, to which Mr.

Sarinzhipov provided responses on January 17, 2022.  Ms. Patricic's questions demonstrated

14

Defendant's commitment to a pre-conceived narrative as they ignored responses Mr. Sarinzhipov had provided and restated allegations that he had already rebutted. For example, while Mr. Sarinzhipov had already explained that Mr. Nazarbayev is "not the owner" of Nazarbayev Fund, Ms. Patrucic ignored that fact and asked again, "Why is the Nazarbayev Foundation owned personally by Nursultan Nazarbayev"? She stated no basis for disregarding Mr. Sarinzhipov's prior response.

48.    Ms. Patricic's questions and Mr. Sarinzhipov's responses include the following (translated from the original Russian):

  a. *Question*: "Why does the Nazarbayev Foundation belong to Nursultan Nazarbayev personally rather than to Nazarbayev University or Nazarbayev Intellectual Schools? Why was it registered in the form of a private fund?"

    i. *Answer*: "The Foundation is a nonprofit organization governed by the principles of autonomy, self-management, collective decision-making, and social accountability and transparency. The Foundation is a classic educational endowment fund consistent with international best practice (the Harvard, Stanford, and Duke endowment funds, etc.) and was created with the sole aim of financing the activity of the autonomous educational institutions Nazarbayev University and Nazarbayev Intellectual Schools and their subsidiary organizations. According to the Foundation's charter, its founder (the First President of Kazakhstan, or Elbasy) has no property rights to the Foundation's assets (is not its owner); he bears no liability for the Foundation's obligations and the Foundation bears no liability for the Foundation's obligations."

  b. *Question*: "Does the Nazarbayev Foundation in actual fact finance Nazarbayev University and Nazarbayev Intellectual Schools? What percentage of the financing is provided by the Nazarbayev Foundation? Can you provide us with documents confirming how much the Foundation has provided to these educational institutions and when this was done?"

    i. *Answer*: "The Foundation was created with the sole aim of financing the activity of NU and NIS, along with their subsidiaries. In line with common international practice for endowment funds, the Foundation uses its investment income to finance research activity (scientific centers and projects for professors and students), acquire any laboratory equipment and consumables needed, support students, and so forth. This approach makes it possible to finance scientific and educational activity in the long term. As of present, the Foundation has provided NU with $46.5 million

(over 20 billion tenge) to cover such expenses. These expenditures are confirmed in the international auditing companies' reports."

c. *Question*: "If the Nazarbayev Foundation's role is to finance Nazarbayev University and Nazarbayev Intellectual Schools, why did these educational institutions need to create their own foundations, namely, the Social Development Foundation and the Development Foundation?"

   i. *Answer*: "The Social Development Foundation and the Development Foundation finance social programs for the benefit of socially disadvantaged students, teachers, and the wider community as part of their community service mission, but they provide no assistance to NU and NIS themselves. The Nazarbayev Foundation cannot finance anything or anyone other than NU and NIS."

d. *Question*: "In 2019, why did the Nazarbayev Foundation become the majority shareholder of Pioneer Capital Invest, which before that had belonged to the corporate foundations Nazarbayev University and Nazarbayev Intellectual Schools?

   i. *Answer*: "The Foundation invested funds in Pioneer Capital Invest in 2019 and became its majority shareholder as part of a deal to acquire and restructure a second-tier bank. In 2017, in response to problems in the banking sector, the NU and NIS foundations set up the investment holding companies Pioneer Capital Invest (PCI) and First Heartland Securities (FHS), which acquired a 100% stake in Expobank JSC. NU, NIS, and their subsidiaries transferred their business and financial assets there. In 2018, the Nazarbayev Foundation injected $200 million of extra capital into PCI. Under a memorandum signed by Kazakhstan's Government, National Bank, and Agency for Regulation of Financial Markets, these funds were used to buy back and top up the capital of Tsesna Bank JSC (2018) and ATF Bank JSC (2020). These banks were consolidated into a single bank, Jusan Bank JSC, and work was done to clean up its portfolios and restructure debts, which overall served to normalize the bank's business and that of its subsidiaries."

e. *Question*: "How much did the Nazarbayev Foundation invest in Pioneer Capital Invest? What was the source of these funds?"

   i. *Answer*: "In 2019, the Foundation invested 70 billion tenge as part of a deal to acquire and restructure a second-tier bank in Kazakhstan. In 2021, the Foundation invested 86 billion tenge as part of a deal to acquire a second-tier bank in the Russian Federation. The source of these Foundation funds was donor funds and contributions along with investment income from previous years."

49.     Mr. Sarinzhipov agreed to answer other questions Ms. Patrucic also sent, noting the requested information is "quite extensive." To aid his task of responding, Mr. Sarinzhipov requested, "you [send] an official information request with a signature (a scanned copy is acceptable). If we need to talk, we can do so by phone or Zoom (depending on where you are). We will be pleased to provide you with more detailed information once we receive your official inquiry."

50.     Later, on January 17, Ms. Patrucic thanked Mr. Sarinzhipov for his response.  She then asked additional questions that again simply ignored the responses Mr. Sarinzhipov had provided.  For example, she asked, does "Mr. Nazarbayev has [sic] final and full control over the Foundation and is able to determine what becomes of the organization and its assets and do with them whatever he sees fit? If this is not the case, then could you please state your reasons?"  Mr. Sarinzhipov had already explained multiple times that Mr. Nazarbayev did not have control over Nazarbayev Fund, having explained that the fund is bound by its charter and by Kazakhstani law to use its funds solely to support NU and NIS.

51.     In her January 17, 2022 questions, Ms. Patrucic further asked (translated from the original Russian),

a.   "What would happen to the Foundation and its assets should Mr. Nazarbayev die or become legally incapacitated?

b.   "In line with the principle of transparency, the Foundation's annual reports and audits have to be accessible to the public, but they are not published anywhere and you have not provided us with copies. Could you please send us copies of these documents?

c.   "According to its incorporation documents, the British company Jysan Technologies has three co-owners, [including] a company called QAZ42 Investment. Given that the latter company is a co-owner along with Pioneer Capital Invest, could you please explain what this company is and who owns it?"

52.    On the morning of January 18, Mr. Sarinzhipov responded, stating (translated

from the original Russian):

> Thank you for your questions.
>
> ***In addition to the information we have already provided***, I can add that
> above all, the Foundation is a nonprofit organization, i.e., it does not
> distribute profit among its founders. According to the Kazakh law on
> nonprofit organizations, in the event of liquidation, all remaining funds
> must be used to further the organization's original objective, namely, to
> finance NU and NIS. ***Therefore, there are no circumstances under which***
> ***the founder can remove funds from the organization.*** The law supersedes
> the charter, and the justice authorities would refuse to register any such
> changes.
>
> As to the case you mention, the Supreme Board of Trustees would be
> composed of the three chairpersons of the boards of trustees of NU, NIS,
> and the Nazarbayev Foundation and would play a coordinating role. All
> three boards would be self-perpetuating, i.e., each year, two thirds of the
> members would select the other third. [O]ur Chief Legal officer, can give
> you more details if required (copied). As a private organization, our rules
> do not allow us to publish our reports in the public domain. However, we
> can provide you with copies if you are willing to sign a non-disclosure
> agreement. The reason for this is that the reports may contain information
> about our foreign partner banks or asset managers. These may have
> objections to the disclosure of their information, and so we would need to
> consult with their legal firms. It may be that we can provide you with just
> the chapters showing the balances rather than with the whole report.
> [Someone else] will answer any queries relating to Jusan. I see that she has
> already sent you some information.
>
> (Emphasis added.)

53.    Mr. Sarinzhipov further explained that while he was traveling, he would be happy

to participate in an interview with Ms. Patrucic and also offered to make a trustee of the

Nazarbayev Fund, NU President Shigeo Katsu, available for an interview as well (translated

from the original Russian):

> I am traveling at present, but I am ready to answer any questions by Zoom
> when I get back home in a couple of days' time. As one of the
> Foundation's trustees, the University President Shigeo Katsu is also ready
> to talk to you.

54.     Later in the day on January 18, 2022, Ms. Patrucic responded and again ignored

Mr. Sarinzhipov's prior responses, asking some of the same questions for a third time where she

had received answers that did not suit OCCRP's preconceived narrative.

55.     Ms. Patrucic wrote (translated from the original Russian):

> Thank you once again for your reply. Unfortunately, there is not much
> time for discussion now before our material is published; the information
> is in the public interest so we need to move ahead.
>
> We have incorporated your statements into our material.
>
> We still believe that the financial reports we requested should also be
> made publicly available, and we would be grateful if you could find a way
> of providing us with copies.
>
> There are also several questions to which you have yet to respond:
>
> 1.     What is there to prevent Mr. Nazarbayev from amending the
> charter as he sees fit or having the Foundation siphon off its assets?
>
> 2.     Who owns QAZ42 Investment, the company that co-owns Jysan
> Technologies (which belongs, of course, to the Nazarbayev Foundation)?
> This company appears to have acquired a shareholding worth $200 million
> for only $20 million. However, because of a lack of transparency, not only
> the public but even we as journalists have been unable to determine who
> made this enormous profit, apparently at the Foundation's expense.
>
> 3.     The Luxembourg company Pioneer Technologies, which is owned
> by another Luxembourg company, Pioneer Horizon East, acquired a stake
> in the Kazakh mobile operator Kcell. Pioneer Horizon East is a "special
> limited partnership" and as such, its owners are not subject to disclosure,
> so only by looking at the British company's documents did we discover
> that Pioneer Horizon East belongs to Jysan Technologies. Why do entities
> belonging to the Foundation make large acquisitions using forms of legal
> ownership that are so lacking in transparency?
>
> We are asking these questions because we consider them to be critically
> important. We do realize that, as founder, Mr. Nazarbayev is unable to
> profit directly from the Nazarbayev Foundation. However, we have read
> the copy of the charter you submitted to us, and it states very clearly that
> as head of the Supreme Board of Trustees, Mr. Nazarbayev has complete
> control over the Foundation's actions.

> For example, he can have the Foundation's assets sold or transferred in a way that benefits him. We have seen this happen with other private foundations set up by Mr. Nazarbayev.
>
> We can talk tomorrow morning at 9:00 CET if you or your colleagues wish to discuss this matter in more detail.

56.     In re-asking these questions, Ms. Patrucic simply disregarded that Mr. Sarinzhipov had already explained that a specific law he cited on January 14, 2022, the *Law on NU, NIS, and NF*, prohibited Mr. Nazarbayev from changing the charter "in any way he wants, or having the foundation move the assets out."

57.     Mr. Sarinzhipov had further explained to Defendant on January 18, 2022 that because the law bars the hypothetical actions Ms. Patrucic posited, "justice authorities will not register such changes" to the Charter were Mr. Nazarbayev to attempt them (and there is no evidence that he ever tried).

58.     Mr. Sarinzhipov had told Ms. Patrucic multiple times that Mr. Nazarbayev legally could not move assets out of the Nazarbayev Fund for any purpose except to fund NU and NIS.

59.     Ms. Patrucic knew that her questions had been answered—but the answers contradicted the narrative to which Defendant was committed irrespective of its falsity.

60.     Ms. Patrucic's statement that Defendant would "appreciate if you could find a way to provide" it with Plaintiff's financial statements was likewise disingenuous when Mr. Sarinzhipov had already offered to do precisely what she asked pursuant to reasonable nondisclosure protections.  Defendant purposefully avoided the truth by refusing to even look at documentation of facts—facts Defendant conceded were important to its reporting—unless OCCRP was able to publish the documents.  This approach was plainly inconsistent with Defendants' treatment of sources who had negative things to say about Plaintiff, for which off-the-record and on-background treatment appears to have been liberally provided.

61.     Ms. Patrucic's email stated that Defendant had "run out of time" despite providing no basis for contending that the Story was hot or breaking news.  The Story was a longform article discussing events that were *years* in the making.

62.     Plaintiff's U.S. legal counsel promptly responded later that evening at 12:51 am on January 19 and asked, "I am following up on Aslan's note below, and on your suggestion of a call or Zoom. Can you let me know what time tomorrow might be convenient to speak about your planned reporting? Thank you."

63.     Despite having just asked the prior afternoon what it called, "fundamentally important" questions, and despite having on the table offers to speak with multiple board members for Plaintiff and to review the financial statements that Ms. Patrucic had requested, Defendant rushed to publish the Story.

64.     At 6:42 am EST on January 19, 2022, Ms. Patrucic responded to Plaintiffs' counsel's email and demanded a response before 8:00 am EST that morning.  She wrote,

> We see no issues remaining in the story that you can help with from United States. The questions we asked could have been addressed by the Foundation days ago. If you receive this email in time, we are willing to hold off publication and talk to you at any point before 8 AM EST. Otherwise the rapidly changing environment in Kazakhstan is compelling us to publish.
>
> If we don't manage to speak before publication, and you are willing to provide us with documents and answers to our question, we would be willing to speak at any point.

65.     Ms. Patrucic claimed that questions she had asked only hours earlier "could have been addressed by [Plaintiff] days ago."  Of course, they in fact *had* been addressed by Plaintiff days ago.  Ms. Patrucic knew this and had rejected the responses because they did not fit Defendant's preconceived narrative.

66.     Defendant raced to publish the Story early in the morning of January 19 before

Plaintiff or its counsel could respond to Ms. Patrucic's early-morning email.

67.     Plaintiff's counsel emailed Ms. Patrucic later on January 19, 2022:

> Thank you Miranda. As best I can tell from the correspondence below,
> Aslan and other have been responding to all of your questions, as recently
> as yesterday. You responded later in the day yesterday with some
> additional questions, which Aslan referred to me. I offered to speak to you
> the same day.
>
> Your response below, sent at 6:42 AM EST this morning, offered me the
> "opportunity" to speak before 8 AM EST, i.e., a window of less than 80
> minutes before the start of the business day. Your story posted shortly
> thereafter.
>
> Unfortunately, rather than have a discussion as you yourself had
> requested, you decided to publish. Your story, as it pertains to NF, is just
> wrong – it is wrong to say, as you did, that NF "is a private organization
> personally founded and controlled by Nursultan Nazarbayev." Aslan made
> this point to you explicitly in the correspondence below. In that
> connection, I note that of the various foundations that were the subject of
> your reporting, it appears that only NF was willing to answer your
> questions and provide documents, a fact that again points to its
> independence.
>
> I cannot understand why you would have foregone the opportunity for
> further engagement with NF, which would have helped assure the
> accuracy of your reporting. You say that my client could have responded
> days ago to your questions, but the most recent questions were only sent
> yesterday, and they responded promptly.
>
> Given the errors in your reporting, we request that you run a correction
> immediately, or else retract those portions of the story pertaining to NF.
> Further, if you intend to do any further reporting about NF – which seems
> likely from your response below – please let us know your questions and
> we would be happy to discuss them with you. And kindly direct all
> inquiries going forward to me. Thank you.

68.     Defendant refused to correct its story, provided no explanation for why it rushed

to publish rather than speak with sources and consult documents, and never explained why it

ignored (and failed to acknowledge in the Story) specific Kazakhstani law that rendered the

Story's core thesis about Plaintiff untrue.

IV.    **The Story Falsely Claims That Plaintiff's Assets *De Facto* Belong to, and Are Entirely Controlled By, Nursultan Nazarbayev**

A.    **The Headline, Subtitle, and Key Findings in the Story Are False and Defamatory**

69.    The Story bears the headline, "The Nazarbayev Billions: How Kazakhstan's 'Leader of the Nation' Controls Vast Assets Through Charitable Foundations" (the "Headline"). A subtitle underneath the headline reads, "The former president — laying low since the country plunged into protest and violence in early January — hid banks, hotels, and a $100 million jet in a network of foundations that answer only to him" (the "Subtitle").

70.    In its entirety, the Story conveys the false and defamatory gist that Plaintiff is a legal fiction through which Mr. Nazarbayev absolutely controls billions of dollars in wealth that is supposed to be earmarked for funding education (the "Gist"). The Story also mentions several other foundations reportedly established by Mr. Nazarbayev and used improperly by him; Plaintiff has no information about the accuracy of those aspects of the Story's reporting. But as to Plaintiff, the Gist of the Story is entirely false.

71.    Both the Headline and the Subtitle are in larger font size than the rest of the article.

72.    The Headline is false and defamatory. In context, the Headline would be reasonably understood by a reader to mean that Mr. Nazarbayev owns assets "through" Plaintiff and that he controls those assets as though he owns them.

73.    As OCCRP knew, it was false to claim that Mr. Nazarbayev owns assets through Plaintiff. Indeed, in far smaller text further in the Story, OCCRP concedes, "Nazarbayev does not formally 'own' this fortune..." In fact, Mr. Nazarbayev does not "formally" own Plaintiff's assets nor does he informally or indirectly own or control them.

74.     As OCCRP further knew, Plaintiff's charter, governance structures, and applicable law meant that Mr. Nazarbayev does not control and own Plaintiff's assets.

75.     The Subtitle says, "The former president — laying low since the country plunged into protest and violence in early January — hid banks, hotels, and a $100 million jet in a network of foundations that answer only to him."  In fact, Defendant knew Plaintiff's charter and Kazakhstani law prevent Mr. Nazarbayev from owning or controlling assets belonging to Plaintiff.

76.     Statements in the Headline and Subtitle are continued in the Story and not meaningfully disclaimed anywhere in the Story.

77.     Underneath the Subtitle, highlighted by a bright red background and bold red bullet points, appears a "Key Findings" section. No other text in the article is highlighted in a similar manner.

78.     The Key Findings section purports to summarize the Story in five bullet points:

   a.   "Kazakhstan's state media has devoted frequent upbeat coverage to the good works performed by Nazarbayev's multiple charitable foundations. But they have another function: Owning assets worth billions of dollars."

   b.   "The Nazarbayev assets under the control of charitable foundations include luxury hotels, banks, factories, warehouses, and other possessions amounting to at least $8 billion."

   c.   "Nazarbayev does not formally 'own' this fortune, but since he is the founder of these organizations, he does control it."

   d.   "Legal experts say that, in this arrangement, he has the ultimate say-so in what the foundations do — and this includes selling or giving away anything they own."

e.   "Because the foundations do not publish annual reports, and some of their assets

are hidden behind secretive foreign commercial structures, there is little

transparency in where these billions are or where they might end up — especially

since the country has plunged into turmoil."

79.   Each bullet in the Key Findings section includes false and defamatory statements,

as to Plaintiff.

80.   In the first bullet, Defendant describes Plaintiff as one of "Nazarbayev's multiple

charitable foundations," despite knowing that Kazakh law prevents Plaintiff from being owned

or controlled by any individual.  Defendant was informed of this in the January 18 email.  Again,

Plaintiff lacks information about the other entities mentioned in the Story.

81.   In the second bullet, Defendant falsely describes Plaintiff's assets as "[t]he

Nazarbayev assets" despite knowing that Mr. Nazarbayev has no ownership or control over

Plaintiff's assets and could not have such ownership or control under Kazakhstan law and

Plaintiff's charter.  Additionally, the second bullet misleads readers as to Plaintiff's holdings, as

it confuses net assets with total assets.

82.   In the third bullet, Defendant alleges Mr. Nazarbayev has "control" over Plaintiff

despite offering no evidence in the story to support that allegation.  In fact, Defendant was aware

as of at least January 18 that under Kazakhstani law and Plaintiff's charter, Mr. Nazarbayev

could not control Plaintiff.

83.   In the fourth bullet, Defendant alleges Plaintiff is controlled by Mr. Nazarbayev to

the extent that he could force Plaintiff to sell or give away "anything they own," despite knowing

this is explicitly prevented by Kazakhstani law and Plaintiff's charter, as Defendant was

informed in the January 18 email.

84.     In the fifth bullet, Defendant indicates Plaintiff has committed fraudulent, corrupt financial transactions despite knowing that Plaintiff's diversified financial holdings in the United Kingdom and European Union are consistent with best practices by the largest and most respected international companies and funds in the world.  Additionally, Defendant implies Plaintiff keeps its annual reports secret for nefarious reasons, when in fact Plaintiff offered to allow Defendant to review its annual reports subject to a non-disclosure agreement, and Defendant declined.

### B.  The Body Text of the Story Contains False and Defamatory Statements

85.     In addition to repeating the false and defamatory statements contained in the Headline, Subtitle, and Key Findings, the Story contains additional false and defamatory statements (together with the Headline, Subtitle, Key Findings, and Gist, the "Defamatory Statements").

86.     The Story falsely stated, "Sarinzhipov did not respond to reporters' questions about what would prevent Nazarbayev from moving assets out of the Foundation for his own benefit, if he chose to do so."  Defendant knew this was false; Mr. Sarinzhipov explained to Ms. Patrucic in multiple emails prior to the Story's publication that Kazakhstani law and the Charter prevented Mr. Nazarbayev from moving assets out of the Nazarbayev Fund for his own benefit.

87.     The Story states that Plaintiff has "secretly acquired stakes in dozens of businesses," despite the fact that there is nothing unlawful or newsworthy about organizations conducting business transactions in private given commercial confidentiality concerns that apply. Additionally, Defendant in fact learned about Plaintiff's transactions through non-secret public filings.

88.     The Story states that Plaintiff engaged in a "highly lucrative" below-market deal with a "mysterious company." Defendant reported in the Story that "a mysterious company

called QAZ42 Investment acquired a 3 percent stake in Jusan Technologies and its billions of assets, effectively diluting the Nazarbayev Foundation's share.  For this stake, worth over $200 million, it paid just $20 million."  In fact, Defendant learned about QAZ42 Investment SPV RSC Ltd's investment in Jusan Technologies through a public filing, and Defendant's reporting about the economics of the deal confuses total assets with net assets and book value with market value. At the time of the deal, Plaintiff received advice from a major international accounting firm to determine a fair market value.  The transaction was at fair market value.

**V.    Defendant Concealed from Its Readers Facts about Kazakhstani Law That It Knew Disproved Its Thesis and Purposefully Avoided the Truth by Not Verifying the Statements of Defendant's Unnamed "Legal Experts"**

89.    As set forth above, Plaintiff told Defendant prior to publication of the Story that Kazakhstani law barred the misuse of funds that Defendant's Story speculated could occur. Plaintiff further informed Defendant that there was a specific law in Kazakhstan that governed Plaintiff, unlike any of the other foundations ultimately mentioned in the Story.  Mr. Sarinzhipov's January 14, 2022 response to Ms. Patrucic's inquiry that same day expressly referenced the Law on NU, NIS, and NF, which provides that Plaintiff's sole purpose is to finance the activities of NU and NIS.  Only an act of Parliament could change this law and the other laws governing Plaintiff's use of funds.

90.    The fact that governing law prohibits Plaintiff from using its assets for any purpose except to fund NU and NIS directly contradicts the core thesis of the Story: that Mr. Nazarbayev has unfettered control over Plaintiff's assets so as to *de facto* own them.

91.    Despite telling Plaintiff, "We have made sure that your statements are reflected in our text," Defendant kept from its readers the facts Plaintiff had shared with its reporter that Kazakhstani laws contradicted the Story's thesis.

92.     Instead, Defendant reported that unnamed "legal experts contacted by OCCRP explained that, under Kazakhstani law, the founder of a private foundation [Mr. Nazarbayev] has ultimate control over its assets."

93.     Defendant knew this was false and that it was at a minimum grossly misleading to describe its so-called "legal experts'" views without reporting the indisputable fact of the Law on NU, NIS, and NF.

94.     Furthermore, Defendant recklessly disregarded the truth by deliberately not raising with Plaintiff its legal experts' bases for their views so that Plaintiff could respond.

95.     The facts that Plaintiff had provided to Defendant's reporters had already provided Defendant with information that caused it to seriously doubt its thesis.  By not verifying with Plaintiff its reporting on its legal experts, Defendant purposefully avoided the truth in reckless disregard of the falsity of its Story.

**VI.    The Story Harms Plaintiff's Ability to Safeguard Assets for Future Generations of Kazakhstani Students**

96.     Defendant's publications through the OCCRP website are expressly said to expose internationally newsworthy crime.  Being featured in their publication in the Story is a devastating blow to Plaintiff's reputation in the international investment and charitable community.

97.     As Plaintiff continues to diversify and safeguard its assets for future generations of Kazakhstani students, its ability to secure opportunities and raise funds will be and has been sharply limited due to the defamatory Story published by Defendant.

98.     The Story has furthermore harmed Plaintiff by harming its relationship with key personnel who fear the reputational harm of being associated with an OCCRP-reported entity. This has cost Plaintiff substantial resources and deprived Plaintiff of human capital.

99.    The Story has also created problems for Plaintiff with its existing counterparties, including banks and asset managers, causing Plaintiff to incur substantial fees.

100.    Defendant's Story has directly and proximately caused in excess of $75,000 of harm to Plaintiff.

### FIRST CAUSE OF ACTION – DEFAMATION

101.    Plaintiff incorporates by reference paragraphs 1 through 100 of this complaint as though fully set forth herein.

102.    Defendant published the Story without authorization or privilege, and it was subsequently viewed by third parties throughout the world.

103.    The Defamatory Statements are each individually and collectively false.

104.    Defendant published the Defamatory Statements with knowledge that they were false or with reckless disregard as to whether they were false.

105.    The Defamatory Statements are defamatory as to Plaintiff in that they injured Plaintiff in its trade and community standing and made it appear odious and infamous.

106.    The Defamatory Statements are each defamatory *per se* because they claim that Plaintiff engaged in fraudulent, dishonest, or criminal conduct.

107.    The Defamatory Statements have caused Plaintiff harm because its business interests have suffered a loss of goodwill value and other pecuniary loss.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for judgment against the defendant as follows:

      1)     For compensatory damages in an amount to be proven at trial in an amount greater than $75,000;

      2)     For punitive damages;

      3)     For pre- and post-judgment interest as permitted by law;

      4)     For the costs of suit as incurred in this action and attorney's fees;

      5)     For permanent injunctive relief; and

      6)     For such other further relief as the Court may deem just and proper.

## <u>DEMAND FOR JURY TRIAL</u>

Plaintiff demands trial by jury on all causes of action asserted within this Complaint.

Dated: Washington, D.C.
July 29, 2022

By:     /s/ Michael Mitchell
BOIES SCHILLER FLEXNER LLP

Michael Mitchell (Bar No. 30352)
1401 New York Ave, NW
Washington, DC 20005
Tel.: (202) 274-2727
Fax: (202) 237-6131
mmitchell@bsfllp.com

Matthew L. Schwartz (*pro hac vice* pending)
55 Hudson Yards
New York, New York 10001
Tel.: (212) 446-2300
Fax: (212) 446-2350
mlschwartz@bsfllp.com

Joseph F. Kroetsch (*pro hac vice* pending)
333 Main Street
Armonk, New York 10504
Tel.: (914) 749-8388
Fax: (914) 749-8300
jkroetsch@bsfllp.com