# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

"NAZARBAYEV FUND" PRIVATE FUND,

        *Plaintiff*,

        *v.*

JOURNALISM DEVELOPMENT NETWORK, INC.,

        *Defendant*.

Civil Action No. 22-cv-1880-JRR

## REPLY MEMORANDUM OF LAW IN FURTHER SUPPORT OF DEFENDANT'S MOTION TO DISMISS THE COMPLAINT

# TABLE OF CONTENTS

**Page**

I.  THE COMPLAINT FAILS TO PLAUSIBLY ALLEGE ANY OF THE FOUR
    ELEMENTS OF DEFAMATION ................................................................... 1

    A.  The Fund Failed To Allege JDN Acted With Actual Malice ................................. 2

        1.  The Fund Is A Public Figure Because Of Its Fame, Power, And
            Influence, And Because It Inserted Itself Into Public Controversies ........... 2

        2.  The Fund Failed Adequately To Plead Actual Malice ................................ 7

    B.  The Fund Cannot Point To Any Plausible Allegations Of Falsity ....................... 10

    C.  None of the Challenged Statements Have Defamatory Meaning ......................... 14

    D.  The Fund Failed To Allege Defamation *Per Se* Or To Allege Special
        Damages Required To Bring A Claim For Defamation *Per Quod* ...................... 17

II. MARYLAND'S ANTI-SLAPP STATUTE APPLIES TO THIS ACTION ................... 18

    A.  The Fund Brought This Lawsuit In Bad Faith ....................................... 18

    B.  The Lawsuit Meets The Remaining Elements Of A SLAPP Action ..................... 20

CONCLUSION ................................................................................... 20

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*1st Team Fitness, LLC v. Illiano*,
228 Md. App. 137 (2016) ...................................................................19

*Agora, Inc. v. Axxess, Inc.*,
90 F. Supp. 2d 697 (D. Md. 2000), *aff'd*, 11 F. App'x 99 (4th Cir. 2001) .......................11, 13

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009) ...........................................................................13

*Batson v. Shiflett*,
325 Md. 684 (1992) .............................................................................7

*Carr v. Forbes, Inc.*,
259 F.3d 273 (4th Cir. 2001) ...............................................................5

*Carrero v. Farrelly*,
310 F. Supp. 3d 542 (D. Md. 2018) ......................................................2

*Chapin v. Knight Ridder, Inc.*,
993 F.2d 1087 (4th Cir. 1993) ......................................................15, 16

*Display Works, LLC v. Pinnacle Exhibits, Inc.*,
2015 WL 7454084 (D. Md. Nov. 24, 2015) .....................................17, 18

*Dunn v. Air Line Pilots Ass'n*,
193 F.3d 1185 (11th Cir. 1999) .......................................................9, 10

*Fairfax v. CBS Corp.*,
2 F.4th 286 (4th Cir. 2021) ..............................................................7, 8

*Gertz v. Robert Welch, Inc.*,
418 U.S. 323 (1974)..........................................................................3, 5

*Harvey v. Cable News Network, Inc.*,
48 F.4th 257 (4th Cir. 2022) .......................................................3, 9, 15

*Hutchinson v. Proxmire*,
443 U.S. 111 (1979) (cited Opp. ) ........................................................5

*Knox v. Mayor & City Council*,
2017 WL 5903709 (D. Md. Nov. 30, 2017) ..........................................20

*M&S Furniture Sales Co. v. Edward J. De Bartolo Corp.*,
   249 Md. 540 (1968) ................................................................................17

*MCB Woodberry Dev., LLC v. Council of Owners of Millrace Condo., Inc.*,
   265 A.3d 1140 (Md. Ct. Spec. App. 2021) ...........................................18

*Mejia v. Telemundo Mid-Atl. LLC*,
   440 F. Supp. 3d 495 (D. Md. 2020) ....................................................2, 7

*National Foundation for Cancer Research, Inc. v. Council of Better Business*
   *Bureaus, Inc.*,
   705 F.2d 98 (4th Cir. 1983) ...................................................................6

*New Life Ctr., Inc. v. Fessio*,
   2000 WL 1157800 (4th Cir. Aug. 16, 2000)...........................................5

*New York Times Co. v. Sullivan*,
   376 U.S. 254 (1964)...................................................................1, 3, 4

*Novick v. Hearst Corp.*,
   278 F. Supp. 277 (D. Md. 1968) ..........................................................17

*Nunes v. Lizza*,
   12 F.4th 890 (8th Cir. 2021) ................................................................16

*OAO Alfa Bank v. Ctr. for Pub. Integrity*,
   387 F. Supp. 2d 20 (D.D.C. 2005).........................................................6

*Reaves v. Westinghouse Elec. Corp.*,
   683 F. Supp. 521 (D. Md. 1988) ...........................................................8

*Rosenblatt v. Baer*,
   383 U.S. 75 (1966)................................................................................3

*Salonen v. Jackson Nat'l Life Ins. Co.*,
   2019 WL 2437283 (D. Mont. June 11, 2019), *aff'd*, 804 F. App'x 691 (9th
   Cir. 2020) ............................................................................................17

*St. Amant v. Thompson*,
   390 U.S. 727 (1968)..............................................................................7

*Tavoulareas v. Piro*,
   817 F.2d 762 (D.C. Cir. 1987) ..............................................................9

*VS Clipper Mill, LLC v. Council of Unit Owners of the Millrace Condo. Inc.*,
   2020 WL 7348633 (Md. Cir. Ct. Nov. 23, 2020) .................................20

*Wells v. Liddy*,
   186 F.3d 505 (4th Cir. 1999) ...............................................................................5

**Constitutional Provisions & Statutes**

U.S. Const. amend. I .................................................................................1, 3, 4, 20

Md. Code Ann., Cts. & Jud. Proc. § 5-807 .........................................................18, 20

The Court should dismiss the Complaint with prejudice.

***First***, the Fund is the quintessential public figure. It was established by the ex-dictator of Kazakhstan—its longest-serving ruler—and has *current* high-ranking government officials on its board. The Fund also has more than $1 billion in assets and is immune from prosecution. Yet the Fund has not come close to satisfying the actual malice standard required by the First Amendment and *New York Times Co. v. Sullivan*, 376 U.S. 254 (1964), a case that the Fund never addresses.

***Second***, the Article also includes no false or defamatory statements. The Fund ignores key statements and caveats in the Article—which JDN repeatedly cited in its motion to dismiss—and it now conjures phantom accusations. If the Article contained an objectively false statement of fact, this Court would expect the Fund to quote it in full and explain why it is false in context. The Fund never does so. *See* Ex. I (chart collecting all of the Fund's direct citations to the Article, none of which is false or defamatory).

***Third***, this case is exactly the type of suit that Maryland's anti-SLAPP statute is designed to prevent. True to its namesake, the Fund acts like an authoritarian bully, trying to coopt the U.S. legal system to quash legitimate journalism and intimidate a smaller organization who dared to publish good-faith investigative reporting that the Fund found offensive. This Court's obligation is to dismiss this SLAPP suit with prejudice.

## I.   The Complaint Fails To Plausibly Allege Any Of The Four Elements Of Defamation

The Article carefully and objectively reports the result of an extensive investigation into the formation, control, investments, and structure of the Fund—which was founded by Mr. Nazarbayev, ostensibly to endow Kazakhstan's flagship public university—as well as other entities founded by Mr. Nazarbayev. The Fund attacks two sets of statements in the Article: the first about Mr. Nazarbayev's "control" of the Fund and its assets, and the second about the Fund's "secrecy." These statements comprise a tiny fraction of the Article, the rest of which is

unchallenged by the Fund—including statements regarding the amount of money the Fund has contributed to the university, its lack of a website or published financial reports, or that Mr. Nazarbayev was a dictator, known for corruption and cronyism during his reign. *See* Mot. at 3-9.

These statements do not satisfy any element of a defamation claim.

## A.    The Fund Failed To Allege JDN Acted With Actual Malice[1]

The Fund alleged *only* actual malice. Compl. ¶ 104. It did not use the word "negligence" once in its Complaint or describe a duty of care that JDN supposedly violated. *See id.* Now, after JDN trounced its claim of actual malice, the Fund tries to pull a fast one by arguing that JDN "does not dispute in its Motion that the Fund has met its pleading burden under a negligence standard." Opp. at 20; *id.* at 3 (arguing, falsely, that "the Fund has pled negligence"). A litigant is "bound by [its] Complaint and cannot amend it through [its] briefs." *Carrero v. Farrelly*, 310 F. Supp. 3d 542, 548 (D. Md. 2018). The Fund, represented by sophisticated counsel, chose to plead actual malice and thereby conceded that it is a public figure. Its own allegations, in any event, show that it is a public figure and that it failed to allege actual malice. That requires dismissal with prejudice.[2]

### 1.    The Fund Is A Public Figure Because Of Its Fame, Power, And Influence, And Because It Inserted Itself Into Public Controversies

#### a.    The Fund Is A General-Purpose Public Figure

---

[1] Because the Fund so clearly fails to establish actual malice, the Court need not address any of the remaining elements of defamation, although they also provide a clear basis for dismissal with prejudice.

[2] The Fund does not seek leave to amend the Complaint to allege negligence (only damages, *infra*), but amendment would be futile anyway. Negligence is satisfied only when a publisher fails to exercise ordinary care, breaching a duty owed to the plaintiff. *See Mejia v. Telemundo Mid-Atl. LLC*, 440 F. Supp. 3d 495, 501 (D. Md. 2020). For reasons explained throughout, the Complaint fails to allege that JDN lacked reasonable grounds for believing that Mr. Nazarbayev controlled the Fund, given that the Fund's charter and the inviolability law proved that to be true. The Fund's proposed non-disclosure agreement also gave JDN reasonable basis to opine about the Fund's secrecy. Finally, the fact that JDN sought the Fund's comment multiple times—and that its Article accurately states and reflects those comments—further disproves any claim of negligence.

The Fund is a general-purpose public figure. It bears the name of Kazakhstan's longest-serving leader and it ostensibly supports Kazakhstan's flagship university—which also bears his name. For the first ten years of the Fund's existence, Mr. Nazarbayev *was still in power*. Compl. ¶¶ 8, 16. That Mr. Nazarbayev left office in 2019 does not mean the Fund suddenly lost its fame or power, or its expectation of press scrutiny. And even though Mr. Nazarbayev left office in 2019, "prominent government officials including the Prime Minister and Minister of Finance, and leaders of NU and NIS all hold trustee positions within Plaintiff's organizational structure." *Id.* ¶ 38.

Because it has government officials on its board, is well-connected, and bears Mr. Nazarbayev's imprimatur, the Fund clearly occupies a position of "such persuasive power and influence" that it must be deemed a public figure for all purposes. *See Gertz v. Robert Welch, Inc*., 418 U.S. 323, 345 (1974); *cf. Harvey v. Cable News Network, Inc.*, 48 F.4th 257, 273 (4th Cir. 2022) (aides to congressmen are general-purpose public figures because of ability to influence government decisions). The fact that the Fund has *current* high-ranking officials on its board also means that the Article's commentary falls squarely within the First Amendment's protections of *political* speech, not just speech on matters of public importance. *See, e.g.*, *Rosenblatt v. Baer*, 383 U.S. 75, 85 (1966) ("Criticism of those responsible for government operations must be free, lest criticism of government itself be penalized.").

More than having "power and influence," and a direct line to the Kazakh government, the Fund is actually *above the law* in that it cannot be prosecuted. *New York Times Co. v. Sullivan* affirmed our First Amendment's commitment to "uninhibited, robust, and wide-open" debate on public issues, which "may well include vehement, caustic, and sometimes unpleasantly sharp attacks on government and public officials." 376 U.S. at 270. The First Amendment, in other words, protects those who speak truth to power; that plainly extends to JDN's investigation into a

powerful, billion-dollar entity that was founded by a 30-year dictator while he was still in office, that has prominent government officials on its board, and that is wholly immune from prosecution. The Fund does not cite or address *New York Times v. Sullivan* a single time in its brief—likely because there is no way to interpret that case and its progeny as *not* covering the Fund.

The Fund's only counterargument, that it is "a little-known endowment based in Kazakhstan," Opp. at 21, defies common sense in light of the above facts. An endowed fund founded by and named for a world leader—for (hypothetical) example, the Nelson Mandela Fund, the Donald Trump Fund, or the Mao Zedong Fund—carries with it the fame or notoriety of its founder, particularly where (as here) there is no effort to distance the fund from its creator. The Fund does not (and could not) deny that Mr. Nazarbayev is a public figure, and offers no coherent argument as to why his eponymous fund is not equivalent for these purposes. In any event, this position was not alleged anywhere in the Complaint and flatly contradicts the Fund's allegation that it has a "reputation in the international investment and charitable community." Compl. ¶ 96.

Last, if the Fund were not a public figure, then the Court should reasonably wonder (a) why JDN devoted the reportorial resources to investigating and writing the Article, and (b) why the Fund hired a top-tier U.S. law firm to make a federal case out of it six months after publication. The existence of the Article, and the meritless lawsuit, establish that the Fund is a public figure. The First Amendment guarantees the right of a Free Press to hold dictators accountable, including billion-dollar organizations that they establish and control, and that are immune from prosecution.

> b.  *The Fund Is Also A Limited-Purpose Public Figure*

The Fund also qualifies as a limited-purpose public figure for the public controversies involving public education and corruption in Kazakhstan discussed in the Article. Each of the Fund's arguments for the five-factor test are implausible and contradicted by the Complaint. *See New Life Ctr., Inc. v. Fessio*, 2000 WL 1157800, at *6 (4th Cir. Aug. 16, 2000) (listing the factors).

**Access to channels of communications**. The Fund's argument that it lacks access to channels of effective communications is belied by the fact that it has more than $1 billion and could buy a media corporation tomorrow. It is thus absurd for the Fund to compare itself to the behavioral scientist—an adjunct professor and state employee—in *Hutchinson v. Proxmire*, 443 U.S. 111 (1979) (cited Opp. at 22). Putting the Fund's $1 billion aside, the Fund alleged that it has a "reputation in the international investment and charitable community," Compl. ¶ 96—which is contrary to its argument now that "its access internationally is extremely limited," Opp. at 22. Even beyond its association with Mr. Nazarbayev, the Fund has powerful connections through its board members, who currently occupy high positions in the Kazakh government. Compl. ¶ 38.[3]

**Prominent role & intent to influence controversy**. Education and cronyism are important and interrelated public controversies in Kazakhstan. To begin, a "public controversy" is a term of art that encompasses not only two-sided debates, but *any* issue of importance that "has received public attention because its ramifications will be felt by persons who are not direct participants." *Carr v. Forbes, Inc.*, 259 F.3d 273, 279 (4th Cir. 2001); Mot. at 24. The Fund's response is to deny that there is any controversy over education; but, as the Fourth Circuit has explained, "education" is a topic of public interest. *See Wells v. Liddy*, 186 F.3d 505, 540 (4th Cir. 1999). Further, the Complaint specifically establishes the importance, not just of public education, but of NU's role in Kazakhstan's national progress and success internationally. Again, NU is the country's flagship university, and it is striving to become "an international research and innovation center" and to

---

[3] The Fund faults JDN for not "cit[ing] any examples of the Fund accessing public media or communications," Opp. at 22. But "access to" means that one *can* access channels *if* necessary to respond to public criticism, not that one has in fact accessed those channels before. *See Gertz*, 418 U.S. at 344 ("public figures usually enjoy significantly greater access to the channels of effective communication and hence have a more realistic *opportunity* to counteract false statements than private individuals normally enjoy.") (emphasis added). Again, given its wealth and power, the Fund has access to channels of effective communications.

prepare its graduates for participation in international scholarship. Compl. ¶¶ 19-24. The success of NU is important to the Kazakh public writ large and, thus, so is its funding. And funding in Kazakhstan is inextricably linked to the country's history of cronyism.

The Fund was founded "exclusively" to finance the NU and "support[] Western-style education and research for *the benefit of the people* of Kazakhstan." Compl. ¶¶ 3, 19-24 (emphasis added). Thus, through its very mission and accumulation of assets and profits, the Fund has voluntarily assumed a special prominence in Kazakhstan's public education controversy and sought to affect the outcome of that issue. *See OAO Alfa Bank v. Ctr. for Pub. Integrity*, 387 F. Supp. 2d 20, 44 (D.D.C. 2005) (oligarchs assumed special prominence in controversy surrounding corruption in Russia because they sought to influence westernization of Russia's economy).

The Fund responds again with its new and implausible claims that it "has a low profile, does not operate high profile businesses, and receives little media attention." Opp. at 23. This is not only absent from the Complaint but also contradicted by the allegation that it has international prominence. Compl. ¶ 96. The Fund cannot distinguish itself from the plaintiff in *National Foundation for Cancer Research, Inc. v. Council of Better Business Bureaus, Inc.*, 705 F.2d 98 (4th Cir. 1983), because it *does* want to "become a household name and received notoriety largely due to its solicitation of funds and public trumpeting of their use." Opp. at 24; Compl. ¶¶ 19-24.

**<u>Pre-existing controversy & plaintiff was a public figure at the time</u>.** The Fund was formed in 2009 to endow public education, and cronyism has been a public problem in Kazakhstan for decades. *See* Mot., Ex. E. The relevant public controversies thus existed well before the Article was published in 2022. And the Fund's new claim that it did not have "online" presence before the Article, *see* Opp. at 24, does not negate its public-figure status at the time. The Fund has always had wealth, power, access to communications, and full immunity from prosecution, all since its

formation. It has cultivated an international reputation through fundraising, and has never ceased using its power and influence to affect the outcome of these controversies. Compl. ¶¶ 19-24, 96.

### 2. The Fund Failed Adequately To Plead Actual Malice

To clear the intentionally high hurdle of actual malice, plaintiff must allege the defendant "made the defamatory statement 'with knowledge that it was false or with reckless disregard of whether it was false or not.'" *Mejia*, 440 F. Supp. 3d at 501 (quoting *Batson v. Shiflett*, 325 Md. 684, 728 (1992)). This requires plausible allegations that the defendant "in fact entertained serious doubts as to the truth of his publication," and it does not matter "whether a reasonably prudent man would have published, or would have investigated before publishing." *St. Amant v. Thompson*, 390 U.S. 727, 731 (1968). As JDN explained, under this standard, courts often toss out defamation suits against similar—if not more explosive—journalism. Mot. at 11 n.4 (collecting cases).

The Fund fails to meet that heightened standard for all of the reasons below, *infra* §§ I.B-C. The Fund's charter, the inviolability law, the non-disclosure of reports and unknown donors, the Fund's request for a non-disclosure agreement, and many other facts gave JDN ironclad support for the Article. But even if the Fund could overcome the hurdles of falsity and defamatory meaning (it cannot), this evidence, *at the very least*, gave JDN a reasonable basis to publish as it did. Nor does it matter that the Fund's representative provided conflicting information. The Fund's *ipse dixit* did not give JDN "actual knowledge" that its opinions were false or even raise "serious doubts." *Fairfax v. CBS Corp.*, 2 F.4th 286, 293-95 (4th Cir. 2021) (plaintiff failed to allege malice where he pleaded that defendant's reporters failed to obtain, pursue, and publish information that his spokesperson provided). If that were enough to allege malice, then every public figure could avoid press scrutiny through denials alone, despite conflicting (and, here, undisputed) evidence.

The Fund's counterarguments on actual malice attack strawmen. For example, the Fund says that based on the pre-publication emails with Mr. Sarinzhipov, JDN should have known that

Mr. Nazarbayev "does not [1] control or [2] own the Fund or its assets." Opp. at 25. As to control, Mr. Sarinzhipov sent JDN the charter, which expressly gave Mr. Nazarbayev power over the Fund, including authority to amend the charter's terms. *See infra* at 10. JDN was not required to adhere to Mr. Sarinzhipov's conflicting account—or, for that matter, even to consult with him before publication. *See Fairfax*, 2 F.4th at 293-95. That JDN *did* investigate and publish the Fund's positions is powerful evidence *negating* malice. *See* Mot. at 27 (citing *Reaves v. Westinghouse Elec. Corp.*, 683 F. Supp. 521, 526 n.6 (D. Md. 1988)). Moreover, as explained below, the entire question about whether the laws to which Mr. Sarinzhipov referred actually had the *effect* of restraining Mr. Nazarbayev's control is a matter of legal interpretation, not a falsifiable fact. The Fund also does not dispute that this interpretation was provided by legal experts, whom JDN consulted and referenced in the Article. As for Mr. Nazarbayev not "owning" the Funds, the Article says exactly that and communicates the Fund's own position on ownership. Ex. A at 2, 8.

The Fund also mischaracterizes the information that Mr. Sarinzhipov provided to JDN about Mr. Nazarbayev's ability to move the Fund's assets for his own benefit, and therefore what JDN "knew" about its statements on the subject. *See* Opp. at 26-27 (arguing that Mr. Sarinzhipov provided information that JDN ignored). In fact, Ms. Patrucic asked Mr. Sarinzhipov twice whether Mr. Nazarbayev's ability to change the Fund's charter meant he could direct the Fund's use of its assets for his personal benefit. Ex. B at 6, 8. Mr. Sarinzhipov never answered *that* question directly, but deflected by stating that the law prevented Mr. Nazarbayev from "*remov[ing]* the funds from the organization." Ex. B at 5, 7 (emphasis added). Contrary to the Fund's arguments, then, JDN did not have a "preconceived narrative," Opp. at 27; JDN had probing questions and the Fund had evasive and non-responsive answers.

The Fund also complains that JDN did not consult it about the inviolability law. Opp. at 28

("If Defendant truly believed that the 'inviolability law' rendered 'toothless and meaningless' the legal safeguards the Fund cited, why did Defendant not say so in its follow-up questions?"). But JDN of course had no duty to provide the Fund with every piece of evidence supporting its assertions in advance of publication. Nor is it clear how this shows a subjective or reckless disregard for the truth, given that the Fund does not dispute the inviolability law itself, which proves the assertions *true*. In any event, it is the Fund's burden to plausibly allege knowledge or reckless disregard at this stage, not JDN's burden to produce evidence that it subjectively believed the inviolability law trumped other laws that supposedly constrained Mr. Nazarbayev's control. *See Harvey*, 48 F.4th at 273 (the plaintiff bears the burden to "plead enough facts to raise the existence of knowledge of falsity above the speculative level" (internal quotation omitted)).

The Fund similarly fails to plead JDN subjectively knew the Article's statements about the secrecy of its assets were false. As noted above, the undisputed fact that the Fund does not publish annual reports, does not have a website, has undisclosed donors, and offers to share information only under non-disclosure agreements all gave JDN a reasonable basis to *opine* that the Fund is "secretive." While ignoring all of those facts, the Fund points only to one transaction that JDN reported based on public filings. *See* Opp. at 26. But that allegation describes a transaction involving Jusan and QAZ42, and was not based on a public disclosure *by the Fund*. Compl. ¶ 88.

Last, even if JDN did not have a hard deadline to publish, "the absence of deadline pressure is probative of nothing" with regard to actual malice, particularly where a defendant conducted a thorough investigation. *Tavoulereas v. Piro*, 817 F.2d 762, 797 (D.C. Cir. 1987*); cf. Dunn v. Air Line Pilots Ass'n*, 193 F.3d 1185, 1207-08 (11th Cir. 1999) (Tjoflat, J., concurring in part, dissenting in part) (a deadline is relevant only if the investigation is "grossly inadequate") (cited

Opp. at 28).[4] JDN conducted a thorough investigation. It then went above-and-beyond by providing the Fund an opportunity for comment and incorporating those comments into its Article.

###### B. The Fund Cannot Point To Any Plausible Allegations Of Falsity

**Control**. The Fund cannot show falsity with respect to Mr. Nazarbayev's control of the Fund. As the Article explains, the Fund's charter grants Mr. Nazarbayev plenary control over the Fund, including the power to rewrite the charter itself. *See* Ex. A at 8 (the charter "stipulates that the first chairman of its highest executive body, the Supreme Board of Trustees, is Nursultan Nazarbayev—and that he has control over the Foundation, including the contents of the charter itself"). JDN repeatedly raised this point in its Motion, noting that "the Article explains, *and the Fund does not dispute*, that the charter gives Mr. Nazarbayev ultimate control over the charter's terms." Mot. at 14 (citing Ex. A at 8; Compl. ¶¶ 75, 81-86) (emphasis added); *see also id.* at 5, 8-9, 12. In its opposition, the Fund cannot explain why the Article's assertion of control is false in light of Mr. Nazarbayev's ability under the charter to amend the charter's terms.

To begin, the Fund claims that Kazakh law "supersedes" the charter and "does not give Mr. Nazarbayev ultimate authority to control the Fund for his own benefit." Opp. at 6, 8 (citing Compl. ¶¶ 4-5, 25-41, 81-83, 89). But the laws to which the Complaint refers provide only that (1) non-profits cannot distribute profits to founders or misuse funds, Compl. ¶¶ 28-30, (2) the Fund and other trustees have the "ability to file suit to block any corrupt dealings by Plaintiff," *id.* ¶¶ 38-39, and (3) if the Fund were liquidated, the assets would be used for charitable purposes, *id.* ¶ 40. Even accepting that these laws are relevant to the defamation analysis (they are not, as discussed below), none of these restrictions undermine the Article's assertion that Mr. Nazarbayev

---

[4] *Dunn* affirmed dismissal for lack of actual malice. *See Dunn*, 193 F.3d at 1198 ("[W]e affirm the district court's summary judgment order on the libel claim because the pilots failed to show both a false statement and actual malice."). The Fund cites the dissenting opinion as precedent.

has ultimate control. Mr. Nazarbayev still has discretion to direct the Fund's activities (and amend its charter) and thus, for example, he has the power to invest in his cronies' companies or purchase private jets for personal use under the pretext of business purposes. *See* Mot. at 15.

More importantly, the Fund's arguments about Kazakh law reveal a fundamental flaw in its claim: that it is attacking only JDN's interpretation of Kazakh law (based on consultation with legal experts), and not any verifiable or historical facts about what *Mr. Nazarbayev or the Fund* have done with their power under those laws. In other words, the Article is, at most, offering a prediction, opinion, or interpretation about what Kazakh law *would permit* Mr. Nazarbayev to do with the Fund and its assets, not what he or the Fund has actually done. *See* Mot. at 15-16.

The Article makes this point crystal clear by stating that, while Mr. Nazarbayev has control to move assets out of the Fund for his own benefit, there is "no evidence that this has happened *so far*." Ex. A at 9 (emphasis added); *see also id*. at 1 (stating it is not clear where the Fund's assets "might end up"). The Fund simply ignores these key caveats in the Article, despite JDN's repeated citations to them. *See* Mot. at 5, 16, 17, 21. Instead, the Fund responds by citing "present-tense statements" in the Article. Opp. at 11. This is too clever by half. As the above statements in the Article demonstrate, "control" is latent. A person can have control of an entity, in the present, but refrain from *exercising* that control to force the entity to act, until some time in the future.

The Fund spends pages trying to reframe this issue as a factual dispute over foreign law, and thus argues that resolution of that issue is not appropriate at this stage. *Id.* at 8-10. The entire line of argument is a red herring. Again, there is no dispute of a verifiable *fact*; there are only differing *opinions* about what the law permits. *See Agora, Inc. v. Axxess, Inc.*, 90 F. Supp. 2d 697, 702 (D. Md. 2000) (opinions are not actionable unless they imply the assertion of undisclosed, false facts), *aff'd*, 11 F. App'x 99 (4th Cir. 2001). Regardless of who has the better reading of

Kazakh law, JDN did not defame the Fund by pointing out that nothing in that law precludes Mr. Nazarbayev from exercising control over the Fund or its assets.

Putting all else aside, the Fund fails to allege falsity because its own allegations acknowledge that Mr. Nazarbayev and the Fund were protected by an inviolability law that immunized them from prosecution. Compl. ¶ 17; Ex. A at 4. Even accepting the Fund's other arguments that Kazakh law limits how funds can be structured or controlled, and provides "sharp penalties," Compl. ¶ 27, the government had no power to enforce those laws against Mr. Nazarbayev and the Fund. Thus, Mr. Nazarbayev had "control" in the obvious sense that neither he nor the Fund would face repercussions for actions he took vis-à-vis the Fund or its assets.

The Fund raised only one allegation about the inviolability law, neither denying it nor explaining why it did not trump the other laws the Fund had cited. According to the Fund, "[i]n June 2022"—after the Article was published—"Mr. Nazarbayev's family lost their constitutional immunity from prosecution, and Mr. Nazarbayev lost his special status as Leader of the Nation." Compl. ¶ 17. The Complaint thereby acknowledges (as it must) that Mr. Nazarbayev and the Fund were, in fact, immune from prosecution at the time of publication.[5]

The Fund responds that "'immunity from prosecution' is not the same as immunity from all law, and Plaintiff never agreed that the Fund or associated persons are unconstrained by Kazakhstani law." Opp. 9. This argument is as illogical as it is audacious. The Article quotes the inviolability law, and the Fund does not deny that Mr. Nazarbayev and the Fund "cannot be held

---

[5] At one point in the brief, the Fund contradicts the Complaint and wrongly suggests the inviolability law did not protect Mr. Nazarbayev and the Fund when the Article was published in January 2022. The Fund argues: "Nor does Defendant explain why a law immunizing a former dictator for his actions while in office would permit him to ignore laws safeguarding the Fund after leaving office, when the Story was published." Opp. at 9. Again, the Complaint alleges that Mr. Nazarbayev did not "lose" immunity until June 2022. Compl. ¶ 17.

responsible" for their actions. Ex. A at 4. Unenforceable laws cannot restrict Mr. Nazarbayev's control, whether or not the Fund wants to "agree" with the basic logic that compels that conclusion. The Fund does not get a veto over common sense; it must *plausibly* allege falsity. *See Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009) (a court may "draw on its judicial experience and common sense").

**Secrecy.** The Fund's arguments with respect to secrecy misrepresent the Article and the Complaint. The most egregious lie is that the Article claims the Fund "is an instrument in an ex-dictator's plan to conceal billions of dollars of assets looted from his country." Opp. at 14. Nowhere does the Article say anything about looting assets from Kazakhstan. The Article *actually* says that the sources of the Fund's assets are "undisclosed donors." Ex. A. at 6. This new accusation is not only absent from the Article, it is not even in the Complaint.

The Fund also states that the Article claims the Fund "conceals Mr. Nazarbayev's assets under the guise of a charity with a secretive structure," and that this is "provably false" because "the Fund's assets are not Mr. Nazarbayev's personal assets." Opp. at 13-14. But the Article says explicitly that Mr. Nazarbayev does *not* "formally own" the assets in the Fund, and that, while he controls the Fund, there is no evidence he removed assets for his benefit. Ex. A at 2, 9. Indeed, the Article itself relays the Fund's public position on this distinction. *Id.* at 8.

As for the second part—that the Fund has a "secretive structure"—that is clearly a qualitative statement and protected opinion. *See, e.g.*, *Agora*, 90 F. Supp. 2d at 702. It is also an opinion based on the *undisputed*, underlying facts that the Fund "has no website, does not publish any reports, and has not publicly disclosed how much money it has received from external donors or Nazarbayev himself." Ex. A at 6. The Fund never denies these facts and, while it may have a different opinion about whether those undisputed facts rise to the level of "secretive," that difference of opinion does not mean the Fund has a colorable claim for defamation.

The Fund also makes much ado about the idea of "concealment" or "hiding." Opp. at 13 ("[T]he Story falsely accuses the Fund of *concealing* Mr. Nazarbayev's personal assets."); *id.* at 14 ("[T]he Story contains a clear factual allegation that the Fund has *concealed* its assets."). But the Fund says nothing about its own claim that it would have shared information with JDN, *only if* JDN signed a non-disclosure agreement. Compl. ¶ 84. Thus, while the Fund now says it has nothing to hide, it sought contractual protection *to prevent the disclosure* of information— meaning, literally, that it wanted to keep information secret, or concealed, or hidden from the public. JDN referred to the non-disclosure agreement repeatedly in its motion to dismiss, *see* Mot. at 7, 17, 29, but the Fund simply disregards this argument and key fact.

Last, the Fund argues it is "false" that the Jusan acquisition was for less than fair market value. Opp. at 16. The Complaint, however, include no plausible allegation that the acquisition was, in fact, for fair market value. The Fund vaguely alleges that it "received advice from a major international accounting firm to determine a fair market value," Compl. ¶ 88, without saying what that advice was. And the Fund says only that JDN "confuses total assets with net assets and book value with market value," *id.*, not what the Fund's own valuation is or why it is correct. That conclusory allegation does not suffice to allege falsity.

### C.     None of the Challenged Statements Have Defamatory Meaning

Because the challenged statements in the Article are not defamatory, the Fund resorts to its fabrications about "loot[ing] from his country." Opp. at 16. Even on the first page of its brief, the Fund invents a new accusation about "money laundering," *id.* at 1, found nowhere in the Article or even the Complaint. That the Fund must invent stuff to make the Article appear defamatory reveals its bad faith and the futility of its lawsuit.

Beyond that, the Fund's response on defamatory meaning ignores the blackletter rule of defamation that the allegedly false statements, not the undisputed facts, must create the defamatory

"sting." *Chapin v. Knight Ridder, Inc.*, 993 F.2d 1087, 1092 (4th Cir. 1993) (affirming dismissal of defamation claim where "the plaintiffs primarily allege the falsity of implications, rather than the facts literally related by the [] article," and explaining that "[a] defamatory implication must be present in the plain and natural meaning of the words used"). For example, the Fund lists many unfavorable facts about Mr. Nazarbayev—that he was dictator for 30 years, that he suppressed political speech and opposition, that he fostered cronyism, *etc*. Opp. at 17-18. It then argues that *"[g]iven this context*, it is defamatory to claim the Fund is a vehicle through which Mr. Nazarbayev controls billions of dollars amassed through cronyism." *Id.* at 18 (emphasis added).

The Fund thus concedes that it is not the assertions that Mr. Nazarbayev controls the Fund or that the Fund is "secretive" that create the "sting," it is the other "context"—by which the Fund means the unflattering *facts* that it does not dispute. The Fund challenges as false only innocuous (and true) statements—and, critically, it never denies that Mr. Nazarbayev was a dictator immune from prosecution. The Fund itself refers to Mr. Nazarbayev as an "ex-dictator." Nor does the Fund deny several other facts that, when added into the mix, also raise legitimate questions. It does not deny that it "has no website, does not publish any reports, and has not publicly disclosed how much money it has received from external donors or Nazarbayev himself." Ex. A at 6. Nor does the Fund deny that over a decade, after raising $1 billion in donations and $200 million in revenue, it provided only $46.5 million to schools that already received $5 billion from the state. The Fund cannot sue JDN for reporting these facts, even if they make the Fund look bad, or even if the Fund believes that those facts *imply* misconduct. *See Harvey*, 48 F.4th at 271 (affirming dismissal where there were no specific accusations of misconduct, and the plaintiff claimed only defamation by an implication from accurately reported facts).

The Fund also argues that when "allegations [of secrecy] falsely imply misconduct, those

statements can be actionable." Opp. at 19. But, again, as the hypothetical shows, the assertion of secrecy does not create the inference of misconduct. Indeed, the Article does not "falsely imply misconduct" through secrecy at all—to the contrary, it explicitly notes the *lack* of evidence of misconduct. *See* Ex. A at 9; *see also Chapin*, 993 F.2d at 1092-93 ("[B]ecause the Constitution provides a sanctuary for truth, a libel-by-implication plaintiff must make an especially rigorous showing where the expressed facts are literally true. The language must not only be reasonably read to impart the false innuendo, but it must also affirmatively suggest that the author intends or endorses the inference."). For that reason, this case is fundamentally different than the case on which the Fund relies, involving a direct accusation of misconduct accomplished through secrecy. *See Nunes v. Lizza,* 12 F.4th 890 (8th Cir. 2021) (article accused a public official of hiding his farm operations because he illegally hired undocumented workers). To the extent the reader might infer fraud or corruption in this case, it is not because the Article directly or indirectly accused the Fund of committing a specific crime through secrecy (it did not); any general inferences of fraud or corruption arise *only* from the true, underlying facts. Thus, there is no defamation.

The Fund selectively quotes and misrepresents JDN's argument. *See* Opp. at 19 ("Defendant *agrees* that 'a reader might reasonably draw the inference of corruption or fraud' from the Story's allegations concerning secrecy and concealment." (partially quoting Mot. at 17)). Again, JDN's brief actually says that a reader might draw an inference based on the undisputed facts, including the "non-disclosure [of annual reports]," but also the percentage of funds allocated to education and, of course, the fact that Mr. Nazarbayev is a powerful ex-dictator. Mot. at 17.

Finally, the Fund argues that JDN cannot "inoculate" itself against defamation by saying that it only "raises questions." Opp. at 18-19. But the Article does not just *say* that as a pretext. It is all that the Article does because, in fact, the Article never levies accusations of fraud or crime—

and the Fund never points to any verifiable or specific accusation in the Article. Once again, the Article states "there is no evidence" of misconduct. Ex. A at 9. The Fund remarkably ignores this statement in the Article, though JDN repeatedly discussed this point. Mot. at 5, 16, 17, 21.

To be sure, the Article did not need to include express caveats (*e.g.*, that it was only "rais[ing] questions" and that there was "no evidence" of siphoning of assets) to be non-defamatory. Nor did it need to (although it did) avoid using qualitative descriptions like "corrupt" or "personal piggybank." JDN cites several cases with articles that were far more explosive, and that specifically accused their subjects of fraud, crime, and bribery—which were dismissed. Mot. at 11 n.4. The Fund does not address any of these cases.

### D. The Fund Failed To Allege Defamation *Per Se* Or To Allege Special Damages Required To Bring A Claim For Defamation *Per Quod*

A statement is defamatory *per se* only if it is self-evident the statement is injurious. *M&S Furniture Sales Co. v. Edward J. De Bartolo Corp.*, 249 Md. 540, 544 (1968). Because nothing in the Article is even defamatory—and the Fund fails to directly quote any defamatory statements, *see supra* §§ I.B-C—the Fund can only suggest that it was defamed by inference. Opp. at 30-31 (arguing the Article "leads to reasonable *inferences* of fraud and corruption" (emphasis added)). This is fatal to the *per se* claim. Inferences are, by definition, not self-evident. *See Salonen v. Jackson Nat'l Life Ins. Co.*, 2019 WL 2437283, at *2 (D. Mont. June 11, 2019) (defamation *per se* "may not be based on innuendo or inference"), *aff'd*, 804 F. App'x 691 (9th Cir. 2020).

The Fund's allegation of defamation *per quod* fares no better, as the Fund does not even address this court's precedent that *per quod* special damages "must be stated with particularity." *Display Works, LLC v. Pinnacle Exhibits, Inc.*, 2015 WL 7454084, at *4 (D. Md. Nov. 24, 2015) (citing *Novick v. Hearst Corp.*, 278 F. Supp. 277, 279 n.2 (D. Md. 1968)). In its Complaint, the Fund only vaguely asserts that the Article harmed its ability to raise funds, cost it substantial

resources, and harmed its relationship with key personnel. Opp. at 31. These conclusory allegations are insufficient. *See Display Works*, 2015 WL 7454084, at *4 (plaintiff must allege with specificity the names of particular donors it lost or quantify a decline in revenue caused by defamation).

## II. Maryland's Anti-SLAPP Statute Applies To This Action

This is the quintessential SLAPP suit: The Fund, a powerful, well-funded, and politically connected organization, seeks to impose serious financial costs on JDN, a small journalism outfit, for truthfully reporting on the Fund's activities. The Maryland legislature enacted the anti-SLAPP statute to protect exactly this type of discourse. *See* Md. Code Ann., Cts. & Jud. Proc. § 5-807(c).[6]

### A. The Fund Brought This Lawsuit In Bad Faith

**Meritless Claim**. A cursory review of the Article reveals that it is legitimate, non-defamatory journalism regarding an issue of public concern. The Article accuses neither the Fund nor Mr. Nazarbayev of crime or corruption—it explicitly states otherwise—and merely opines that the Fund lacks transparency and oversight. Because the Article is inoffensive, the Fund willfully misrepresents it in its brief, confirming the lack of merit in its claim and further proving bad faith.

As noted above, the Fund repeatedly invents phantom accusations. It says that JDN accused the Fund of aiding in a "money laundering scheme" to conceal the personal wealth that he amassed by "loot[ing] from his country," and accused Mr. Nazarbayev of using the Fund as a "private slush fund for him and members of his family" and as his "personal piggybank." Opp. at 1-2, 5, 13-14, 16, 17. But the Article explicitly states "there is no evidence" Mr. Nazarbayev "mov[ed] assets out

---

[6] The Fund does not dispute that the Court may find bad faith at this stage. *See* Opp. at 32-34; *MCB Woodberry Dev., LLC v. Council of Owners of Millrace Condo., Inc.*, 265 A.3d 1140, 1159 (Md. Ct. Spec. App. 2021). Nor does it dispute that bad faith requires dismissal with prejudice. *Id.* at 1157 (anti-SLAPP Statute requires "expeditious dismissal of a SLAPP suit before [the defendant is] forced to expend time and money defending the suit"). The Fund seeks leave to amend its Complaint *only* with respect to damages. Opp. at 32 n.9. But the Fund is represented by competent counsel who had six months to investigate and allege damages with specificity. Further, the failure to plausibly allege any of the *other* elements of defamation requires dismissal with prejudice.

of the Foundation for his own benefit," and it further clarifies that he did not "own this fortune." Ex. A at 9; *see* Mot. at 5, 16, 17, 21. The Fund's intentional misrepresentations show bad faith.

The Fund's brief compounds its bad-faith reading of the Article by misrepresenting *its own* Complaint. For example, the Fund now claims that it is a "little-known endowment," Opp. at 21, despite alleging that it has a "reputation in the international investment and charitable community." Compl. ¶ 96. The Fund also claims that it "pled negligence," Opp. at 3, 20, when in fact it only pleaded actual malice, *see id*. ¶ 104.

**Punitive Damages**. The Fund seeks punitive damages, without any basis in law or fact. The Fund now quibbles that it did not specify an amount, Opp. at 33, but the very fact that it is asking a court to punish journalists for reporting on a powerful entity shows that this lawsuit is brought in bad faith. Punitive damages require clear and convincing evidence of "actual malice." Mot. at 27 n.9; *1st Team Fitness, LLC v. Illiano*, 228 Md. App. 137, 152 (2016). The Fund has no such evidence, much less plausible allegations, and it fails to address the robust evidence to the contrary establishing JDN's subjective good faith. *See supra* § I.A.2. The Fund wields the threat of punitive damages as a cudgel to silence a smaller reportorial organization of lesser means.

**Suspicious Timing**. The Fund claims that it delayed filing its lawsuit because it was waiting to see if the harm allegedly caused by the Article would "subside." Opp. at 34. This is backwards. A defamed organization does not wait months to vindicate its reputation; there is little sense in the Fund waiting for the alleged harm to subside when it could have prevented that harm by immediately seeking vindication of its reputation in court. And the Fund does not even bother justifying its delay of service of process. The only conceivable inference from the Fund's inexplicable delays is that this lawsuit had nothing to do with the truth of the Article's assertions, but was brought by the Fund to retaliate against OCCRP now that the issues raised in the Article

are subjecting the Fund to public accountability. *See* Mot. at 33-34.

## B. The Lawsuit Meets The Remaining Elements Of A SLAPP Action

**Public Concern**. The Article is plainly a matter of public concern. It was published amidst widespread protests and a national reckoning on Mr. Nazarbayev's reign over Kazakhstan, and investigates the activities of four entities that Mr. Nazarbayev founded. Those entities contain billions of dollars of assets. Mot. at 33. The Fund asserts, without citation to any legal authority, that the Article must be of public concern in the United States to receive anti-SLAPP protection. Opp. at 35. But Maryland's anti-SLAPP statute provides that the protected communication may pertain to "any issue of public concern." Md. Code Ann., Cts. & Jud. Proc. § 5-807(b)(1).

**Inhibits Free Speech**. The Fund misconstrues § (b)(3) of the anti-SLAPP statute, manufacturing a requirement that JDN demonstrate the Fund's subjective intent to inhibit free speech. The plain text of the statute requires that the lawsuit was "intended to inhibit *or* inhibits" the exercise of First Amendment rights. *Id.* (b)(3) (emphasis added). JDN alleged that the lawsuit inhibits the exercise of its investigative reporting—core First Amendment activity—because it imposes substantial costs and diverts resources away from its journalism. The statute requires nothing more. *See VS Clipper Mill, LLC v. Council of Unit Owners of the Millrace Condo. Inc.*, 2020 WL 7348633, at *4-5 (Md. Cir. Ct. Nov. 23, 2020) (the "ability to debate the issues [of public concern] must be 'uninhibited, robust, and wide-open'"). In any event, JDN established the Fund's intent to inhibit free speech. Unlike in *Knox v. Mayor & City Council*, 2017 WL 5903709, at *11 (D. Md. Nov. 30, 2017), JDN has alleged (1) the meritless claim, (2) its suspicious timing, (3) the unwarranted request for punitive damages, and (4) briefing riddled with misrepresentations, all showing that the purpose of the lawsuit is to intimidate and punish JDN.

## CONCLUSION

For the above reasons, and those in JDN's Motion, the Court should dismiss with prejudice.

Dated: December 13, 2022　　　　　　　Respectfully submitted,
　　　　　Baltimore, Maryland

　　　　　　　　　　　　　　　　　　_/s/ Mark A. Perry_
　　　　　　　　　　　　　　　　　Mark A. Perry (Bar No. 30479)
　　　　　　　　　　　　　　　　　Andrew S. Tulumello (Bar No. 15494)
　　　　　　　　　　　　　　　　　WEIL, GOTSHAL & MANGES LLP
　　　　　　　　　　　　　　　　　2001 M Street NW, Suite 600
　　　　　　　　　　　　　　　　　Washington, DC 20036
　　　　　　　　　　　　　　　　　Telephone: 202.682.7511
　　　　　　　　　　　　　　　　　Fax: 202.857.0940
　　　　　　　　　　　　　　　　　mark.perry@weil.com
　　　　　　　　　　　　　　　　　drew.tulumello@weil.com

　　　　　　　　　　　　　　　　　Mark I. Pinkert (admitted _pro hac vice_)
　　　　　　　　　　　　　　　　　WEIL, GOTSHAL & MANGES LLP
　　　　　　　　　　　　　　　　　1395 Brickell Avenue, Suite 1200
　　　　　　　　　　　　　　　　　Miami, FL 33131
　　　　　　　　　　　　　　　　　Telephone: 305.577.3148
　　　　　　　　　　　　　　　　　Fax: 305.374.7159
　　　　　　　　　　　　　　　　　mark.pinkert@weil.com

　　　　　　　　　　　　　　　　　Benjamin A. Apfel (admitted _pro hac vice_)
　　　　　　　　　　　　　　　　　Nicholas J. Reade (admitted _pro hac vice_)
　　　　　　　　　　　　　　　　　WEIL, GOTSHAL & MANGES LLP
　　　　　　　　　　　　　　　　　767 Fifth Avenue
　　　　　　　　　　　　　　　　　New York, NY 10153
　　　　　　　　　　　　　　　　　Telephone: 212.310.8000
　　　　　　　　　　　　　　　　　benjamin.apfel@weil.com
　　　　　　　　　　　　　　　　　nick.reade@weil.com

　　　　　　　　　　　　　　　　　_Counsel for Defendant_
　　　　　　　　　　　　　　　　　_Journalism Development Network, Inc._

**CERTIFICATE OF SERVICE**

I, Mark A. Perry, hereby certify that on December 13, 2022, I caused the foregoing to be served upon all counsel of record electronically via the Court's electronic filing service.

 /s/ Mark A. Perry
Mark A. Perry (Bar No. 30479)